IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

2019 APR -4 P 1:33

RECEIVED

DEBRA P. HACKETT, CLK
U.S. DISTRICT COURT
MIDDLE DISTRICT ALA

| | |
|---|---|
| CHARLES L. BURTON, JR., <br><br> Plaintiff, <br><br> v. <br><br> JEFFERSON DUNN, Commissioner, Alabama Department of Corrections, <br><br> Defendant. | No. 2:19-cv-242-ECM <br><br><br> **CAPITAL CASE** |

## COMPLAINT

Plaintiff Charles L. Burton, Jr. brings this action under the Religious Land Use and Institutionalized Persons Act of 2000 ("RLUIPA"), 42 U.S.C. §§ 2000cc *et seq.*, the Alabama Religious Freedom Amendment to its State Constitution ("ARFA"), and the Establishment Clause and Free Exercise Clause of the First Amendment to the United States Constitution pursuant to 42 U.S.C. § 1983.

### PRELIMINARY STATEMENT

1.   An Alabama jury has sentenced Mr. Burton to death, and he presently awaits that fate at the Holman Correctional Facility ("Holman") in Atmore, Alabama.

2.   Mr. Burton converted to Islam 47 years ago and is a devout Muslim.

3.   As part of his faith, Mr. Burton has a sincerely held religious belief in the importance of a religious advisor of the Muslim faith (an imam) to be physically present in the execution chamber at the time of his execution, to provide spiritual

1

comfort and ease his transition from the world of the living to that of the dead. Absent the secure promise of an imam at that time and place, Mr. Burton has suffered and will continue to suffer grave spiritual and emotional harm.

4.     Mr. Burton therefore asks for an imam to be physically present with him in the execution chamber at the time of his execution.

5.     Mr. Burton also objects to having Chaplain Chris Summers, a mainline Protestant Christian and the only chaplain employed at Holman, physically present with him in the execution chamber at the time of his execution—as Chaplain Summers has been at virtually every execution at Holman over the past 20 years.

6.     The Alabama Department of Corrections (the "ADOC"), however, has made clear it will not accommodate such a request or objection.  The ADOC has done so despite having cleared religious leaders from other faiths to visit Holman and spend time with death-sentenced inmates without a physical barrier, and despite the demonstrated feasibility of having a religious advisor in the execution chamber at the time of execution, as evidenced by the prison chaplain's attendance at virtually every execution at Holman over the past 20 years.

7.     The ADOC's actions violate two of the most elementary principles of our constitutional democracy, principles that the law requires to be honored even in prison:  to be able to practice one's religion free from substantial and unjustified governmental burdens, and to be free from governmental discrimination based on one's religion.

8.      The foregoing principles are all the more important at the time of an inmate's execution, when the state inflicts the most severe punishment available and the stakes for the condemned could not be higher.

9.      Mr. Burton's request for the physical presence of a religious advisor of his faith to minister to him at the moment of his death is not the first such request the ADOC has refused.

10.     On February 7, 2019, the State of Alabama executed a Muslim inmate at Holman, Domineque Hakim Marcelle Ray, without the presence of an imam in the execution chamber.    Mr. Ray had requested that the ADOC exclude Chaplain Summers from the chamber and permit his imam to be present instead.   Although the ADOC ultimately agreed to "waive the presence of the Protestant chaplain in the execution chamber" for Mr. Ray's execution, it would not allow the imam.

11.     In briefing on a motion to stay the execution in Mr. Ray's case, the ADOC initially suggested that it had changed the policy to bar all religious advisors from the execution chamber, including the prison chaplain.   However, the ADOC amended that briefing and made clear that it has made no change to the policy.   In other words, the ADOC continues to require the presence of the prison chaplain, who is a mainline Protestant Christian, in the execution chamber during executions and to exclude the religious advisors of the sincerely held faiths of other death row inmates.

3

12.    After the District Court for the Middle District of Alabama denied the motion for an emergency stay of execution to resolve the RLUIPA and constitutional challenges to the ADOC's policy, Mr. Ray appealed to the Court of Appeals for the Eleventh Circuit. On February 6, 2019, a three-judge panel granted a stay "in the face of what we see as a powerful Establishment Clause claim. . . . The central constitutional problem here is that the state has regularly placed a Christian cleric in the execution room to minister to the needs of Christian inmates, but has refused to provide the same benefit to a devout Muslim and all other non-Christians." *Ray v. Comm'r*, 915 F.3d 689, 695, 697 (11th Cir. 2019). The court added that Mr. Ray's claims "may well fit under the rubric of RLUIPA as well." *Id.* at 700.

13.    The ADOC then petitioned to the U.S. Supreme Court to vacate the stay of execution. In a 5-4 decision vacating the stay, the Court concluded that Mr. Ray's RLUIPA and Establishment Clause challenges were untimely and declined to address the merits of the case. *See Dunn v. Ray*, 586 U.S. __, 139 S. Ct. 661 (2019) (mem.).

14.    Justice Kagan dissented. She observed that "[t]he clearest command of the Establishment Clause . . . is that one religious denomination cannot be officially preferred over another. But the State's policy does just that. Under that policy, a Christian prisoner may have a minister of his own faith accompany him into the execution chamber to say his last rites. But if an inmate practices a different religion—whether Islam, Judaism, or any other—he may not die with the minister of his own faith by his side. That treatment goes against the Establishment Clause's core

4

principle of denominational neutrality." *Id.* at 661-62 (Kagan, J., dissenting) (internal quotation and citation omitted).[1]

15.     Less than two months later, on March 28, 2019, and without citing the grounds, the Supreme Court granted an application for a stay of execution in the case of a Texas inmate of the Buddhist faith who was similarly denied the presence of his religious advisor in the execution chamber at the time of his execution. *See Murphy v. Collier*, 587 U.S. __, 2019 WL 1410989 (2019) (mem.) ("The State may not carry out Murphy's execution . . . unless the State permits Murphy's Buddhist spiritual advisor or another Buddhist reverend of the State's choosing to accompany Murphy in the execution chamber during the execution."). The Texas prison employed Christian and Muslim chaplains but no chaplains of other faiths.

16.     There is no date set for Mr. Burton's execution. Accordingly, this case concerns the circumstances surrounding Mr. Burton's pending execution and is not seeking and does not require a stay of execution at this time.

17.     Mr. Burton brings this action now to avoid Mr. Ray's fate—and that of Mr. Murphy before the Supreme Court came to his aid—in being denied on timeliness grounds the promise and reality of the right to spiritual guidance and

---

[1]     Under the ADOC's policy, an inmate will, in the words of Justice Kagan, be denied a "minister of his own faith" not only if he or she "practices a different religion," but also if the inmate adheres to any form of Christianity outside the scope of mainline Protestantism. *Ray*, 139 S. Ct. at 662 (Kagan, J., dissenting).

5

comfort at the time of his execution through the presence of a religious advisor of his faith in the execution chamber, in accordance with his sincerely held religious beliefs.

18.   Based on the ADOC's current policy and its pattern and practice with respect to executions, absent relief from this Court, the ADOC will continue to enforce a policy of requiring a prison chaplain, who is a mainline Protestant Christian, in the execution chamber at the time of execution and of excluding the religious advisors of the sincerely held faiths of other death row inmates, including an imam for Mr. Burton.

## JURISDICTION & VENUE

19.   The Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 (federal question) and 1367 (supplemental jurisdiction over state law claims).

20.   Venue is appropriate in the Middle District of Alabama.  Commissioner Dunn is being sued in his official capacity as the Commissioner of the Alabama Department of Corrections, which is headquartered in Montgomery, Alabama and within this District.  28 U.S.C. § 1391(b)(1), (c)(2).

## PARTIES

21.   Plaintiff Charles L. Burton, Jr. is a citizen and a resident of the State of Alabama.  Mr. Burton is incarcerated and subject to execution at Holman by the State of Alabama pursuant to a state court judgment of conviction for capital murder.  Mr. Burton was found guilty because the killing was committed during the course of a

robbery. But Mr. Burton did not shoot anyone, did not witness the shooting, and was outside of the business that was robbed when the shooting transpired.

22. Defendant Jefferson Dunn is the Commissioner of the ADOC and is responsible for the development and implementation of the protocol and procedures governing the execution of death-sentenced inmates in the State of Alabama. He has the sole authority to alter, amend, or make exceptions to the protocol and procedures governing the execution of death-sentenced inmates in the State of Alabama.

## CASE OR CONTROVERSY

23. There is a real and justiciable case or controversy between the parties.

24. Commissioner Dunn has implemented and enforced a policy that infringes on Mr. Burton's rights under RLUIPA and ARFA and that violates the Establishment Clause and the Free Exercise Clause of the First Amendment.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

25. There are no available administrative remedies to be exhausted, as "[t]he policies and procedures of the Department of Corrections for execution of persons sentenced to death shall be exempt from the Alabama Administrative Procedure Act, Chapter 22 of Title 41." Ala. Code § 15-18-82.1(g).

## FACTUAL ALLEGATIONS

26. Mr. Burton converted to Islam in 1972 and is a devout Muslim.

27. The ADOC has recognized Mr. Burton as a practicing Muslim throughout the time he has served on death row, since 1992. The ADOC has

7

provided Mr. Burton a religious identification pass and allows him to grow a beard and to keep a Qur'an and prayer rug in his cell.

28.     Mr. Burton observes daily Muslim prayer rituals, meets regularly with the two imams who visit Muslim death row inmates at Holman, and participated in a weekly prayer service with other Muslim inmates until physical infirmities made regular attendance difficult.

29.     Alabama conducts executions at Holman.  *See* Ala. Code § 15-18-82(b).

30.     The ADOC employs a prison chaplain at Holman.

31.     Since 1997, the only prison chaplain employed at Holman has been Chaplain Chris Summers, a mainline Protestant Christian.

32.     The ADOC takes the position that its execution protocol is secret and not subject to disclosure.

33.     Nonetheless, the information set forth below in Paragraphs 34-46 and 50-53 is now known regarding the State's execution protocol.

34.     The prison chaplain is permitted and required to be present in the execution chamber with the death row inmate and is permitted to provide emotional and physical ministrations.

35.     The ADOC conducts executions on Thursdays.

36.     The ADOC schedules executions to begin at 6 p.m. Central Time on the specified date.

37.     On the Monday, Tuesday, Wednesday, and Thursday of the week of an execution, the death-sentenced inmate is permitted exclusive use of Holman's indoor visitation yard.

38.     On these days, the death-sentenced inmate may see his or her family, friends, attorneys, and religious advisors who have been placed on a preapproved list.

39.     All meetings in the visitation yard during the week of an execution are "contact visits"—that is, they take place without a barrier between the inmate and the visitors.

40.     The death-sentenced inmate is moved from his or her normal cell to the death watch cell on the Tuesday before the scheduled execution.

41.     The death watch cell is located just steps from the execution chamber.

42.     On the day of the execution, the death-sentenced inmate is removed from the visitation yard at approximately 4:30 p.m. Central Time and returned to the death watch cell to await his transfer to the execution chamber.

43.     The death-sentenced inmate is not permitted to meet with legal counsel, friends, or family after being removed from the visitation yard on the day of the execution.

44.     The death-sentenced inmate is permitted to meet with his or her religious advisor in the death watch cell before being taken to the execution chamber. These meetings are contact visits.

9

45.    At some point thereafter, if the religious advisor is anyone other than the prison chaplain, he or she is required to leave.

46.    Depending on the circumstances, several hours may elapse between the religious advisor's departure from the death watch cell and the death-sentenced inmate's execution in the chamber.  The prison chaplain, however, is permitted to remain in the death watch cell during this time.

47.    For example, during the execution of Mr. Ray, his imam was required to leave the death watch cell at approximately 5:15 p.m. Central Time on the day of his execution, even though a stay was in place (and remained in place for nearly three more hours).  Mr. Ray was not removed from the death watch cell until after 8 p.m. Central Time (after the Supreme Court vacated the stay).

48.    As such, Mr. Ray was deprived of the presence and counsel of his imam for more than three hours immediately preceding his execution, and at a time when he did not know whether he was going to live or die.

49.    The prison chaplain could have remained in the death watch cell during this time should Mr. Ray have wanted him to stay.

50.    During the execution, the prison chaplain stands inside the execution chamber, facing the death-sentenced inmate, approximately four feet from the death-sentenced inmate's feet, to the inmate's left.

10

51.     The   death-sentenced   inmate's   designated   execution   witnesses—
including any religious advisor—are located outside the execution chamber in a room
behind a large, partially opaque window to the inmate's left.

52.     Once in the execution chamber, a death-sentenced inmate who wishes to
have physical contact with a religious advisor while making a final prayer or engaging
in any desired religious practice may do so only with the prison chaplain.

53.     During the execution, if an inmate requests prayer, the prison chaplain
will kneel at his side and pray with him.

54.     Chaplain Summers has been present at every execution at Holman over
the past 20 years, except for that of Mr. Ray.

55.     No religious advisor of any faith other than mainline Protestantism has
been present in the execution chamber during an execution over the past 20 years.

56.     The ADOC has identified no specific security concern or any other
reason to explain why a religious advisor of another faith, or another variation of the
Christian faith, could not be trained on prison protocol and allowed to be present in
the execution chamber during an execution.

57.     The ADOC otherwise allows religious advisors who are not ADOC
employees to visit inmates on death row through a volunteer program.

58.     The ADOC conducts a thorough security clearance of these religious
advisors and requires them to complete volunteer training. *See, e.g.*, State of Alabama

11

Dep't of Corrections Admin. Reg. No. 462 (2015), *available at* http://www.doc.state.al.us/docs/AdminRegs/AR461.pdf.

59.     The two imams with whom Mr. Burton visits regularly have successfully completed the ADOC's volunteer training and are approved for physical visits without any barrier between themselves and him.

60.     Mr. Burton knows Chaplain Summers through his employment at Holman.  Mr. Burton has spoken to Chaplain Summers in the past but does not visit with him for spiritual guidance and does not have a faith-based relationship with him.

61.     Mr. Burton does not believe he will derive any comfort or meaningful guidance from the presence of Chaplain Summers in the execution chamber at the time of his execution.   To the contrary, the prospect and reality of Chaplain Summers's presence at Mr. Burton's execution substantially burdens his religious exercise.

62.     Mr. Burton accordingly objects to the presence of Chaplain Summers, or any other chaplain of a non-Muslim faith, in the execution chamber during his execution.

63.     In any event, it is integral to Mr. Burton's faith that he have an imam physically present with him at the time of his execution, and it is a substantial burden on his religious exercise to have been denied his request for the imam's presence at that time and place.

64.     Mr. Burton's faith teaches him that the point of transition between life and death is important and that an imam can provide spiritual guidance during this difficult time. Mr. Burton believes that having an imam in the execution chamber with him at the time of execution would provide him spiritual comfort and help relieve his struggle as he passes, including by holding his hand, praying with him in his final moments, and easing the transition between the worlds of the living and the dead.

65.     An imam also could help Mr. Burton remember a declaration of faith and other supplications that are recited by Muslims at the time of death. An imam could offer prayers expressing Mr. Burton's spiritual intention to be positioned in the direction of Mecca, as is the recommended practice, even if Mr. Burton cannot physically face this direction in the execution chamber. An imam could also recite verses from the Qur'an which, according to the Muslim tradition, will relieve the pangs of death.

66.     The promise and reality of these practices would provide Mr. Burton comfort, strengthen his resolve, and help him properly express to God his repentance for any wrongs he has committed.

67.     Mr. Burton has opted for nitrogen hypoxia as the method of his execution. Regardless of the execution method, the ADOC has had a policy of requiring the prison chaplain and no other religious advisor in the execution chamber at the time of execution.

68. Based on the ADOC's policy and its pattern and practice over decades of executions, absent relief from this Court, the prison chaplain, who is a mainline Protestant Christian, and not an imam will be present in the execution chamber at the time of Mr. Burton's execution regardless of the method of execution.

## FIRST CAUSE OF ACTION
### Violation of the Religious Land Use and Institutionalized Persons Act
### (42 U.S.C. § 2000cc)

69. Mr. Burton re-alleges and incorporates by reference the allegations set forth in Paragraphs 1-68 above.

70. RLUIPA, in relevant part, provides:

> No government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution . . . even if the burden results from a rule of general applicability, unless the government demonstrates that imposition of the burden on that person—
>
> (1)    is in furtherance of a compelling governmental interest; and
>
> (2)    is the least restrictive means of furthering that compelling governmental interest.

42 U.S.C. § 2000cc-1(a); *see also Holt v. Hobbs*, 135 S. Ct. 853, 862 (2015) ("RLUIPA provides greater protection [than the First Amendment]. RLUIPA's 'substantial burden' inquiry asks whether the government has substantially burdened religious exercise . . . not whether the RLUIPA claimant is able to engage in other forms of religious exercise.").

14

71.     The ADOC "receives Federal financial assistance" and is subject to RLUIPA. 42 U.S.C. § 2000cc-1(b)(1).

72.     Mr. Burton is an institutionalized person under RLUIPA.   42 U.S.C. § 1997(1), (3); § 2000cc-1(a).

73.     Mr. Burton is a devout Muslim who holds a sincere religious belief that the presence of an imam in the final moments of life is an important aspect of his exercise of religion.  Mr. Burton also holds a sincere religious belief that the presence of the prison chaplain—a mainline Protestant Christian—in the execution chamber will not only deprive him of any spiritual comfort but will in fact cause him spiritual harm.

74.     The ADOC policy therefore violates Mr. Burton's rights under RLUIPA in two overlapping, yet distinct, respects.

75.     First, the ADOC policy of prohibiting an imam in the execution chamber at the time of Mr. Burton's execution violates RLUIPA by substantially burdening Mr. Burton's religious exercise without adequate justification.

76.     The ADOC has recognized the importance of religious counsel at the time of death by, for decades, requiring the prison chaplain to be present in the execution chamber.

77.     Moreover, declining to accommodate Mr. Burton's sincere religious belief by allowing his imam in the execution chamber does not further a compelling governmental interest or any governmental interest for that matter.  In any event,

15

excluding an imam from the execution chamber is not the least restrictive means of furthering any compelling governmental interest—particularly when the State has, for decades, demonstrated its ability to allow the prison chaplain in the execution chamber without compromising any such interest.

78.   Additionally, as RLUIPA itself makes clear, a government may need to "incur expenses in its own operations to avoid imposing a substantial burden on religious exercise." 42 U.S.C. § 2000cc-3(c); *see also Holt*, 135 S. Ct. at 860.[2]

79.   Second, the ADOC policy of requiring the prison chaplain, a mainline Protestant Christian, in the execution chamber over Mr. Burton's religious objection also violates RLUIPA by substantially burdening his religious exercise without adequate justification.

80.   Moreover, the requirement of the prison chaplain, a mainline Protestant Christian, in the execution chamber at the time of a Muslim inmate's execution does not further any compelling governmental interest.   In any event, the mandatory

---

[2]   Mr. Burton need not establish or negate a compelling governmental interest or that the means selected are the least restrictive, as that burden rests on Commissioner Dunn.   42 U.S.C. § 2000cc-2(b) ("[T]he government shall bear the burden of persuasion on any element of the claim, except that the plaintiff shall bear the burden of persuasion" as to whether the challenged action "substantially burdens the plaintiff's exercise of religion."); *Holt*, 135 S. Ct. at 864 (under "RLUIPA's rigorous standard," the institution "is require[d] . . . not merely to explain why it denied an exemption but to prove that denying the exemption is the least restrictive means of furthering a compelling governmental interest").

presence of the prison chaplain in the execution chamber is not narrowly tailored to achieve any such interest.

## SECOND CAUSE OF ACTION
### Violation of the Alabama Religious Freedom Amendment
### (Ala. Const. Art. I, § 3.01)

81.     Mr. Burton re-alleges and incorporates by reference the allegations set forth in Paragraphs 1-80 above.

82.     The Alabama Religious Freedom Amendment to the State Constitution provides:

(a)     Government shall not burden a person's freedom of religion even if the burden results from a rule of general applicability, except as provided in subsection (b).

(b)     Government may burden a person's freedom of religion only if it demonstrates that application of the burden to the person:

(1)     Is in furtherance of a compelling governmental interest; and

(2)     Is the least restrictive means of furthering that compelling governmental interest.

Ala. Const. Art. I, § 3.01.

83.     The ADOC policy violates the ARFA in two overlapping, yet distinct, respects.

84.     First, the ADOC policy of prohibiting an imam in the execution chamber at the time of execution violates the ARFA by substantially burdening Mr. Burton's religious exercise without adequate justification.   Among other things, the

ADOC has recognized the importance of religious counsel at the time of death by, for decades, requiring the prison chaplain to be present in the execution chamber.

85.     Moreover, declining to accommodate Mr. Burton's sincere religious belief by allowing his imam in the execution chamber does not further a compelling governmental interest or any government interest for that matter.   In any event, excluding an imam from the execution chamber is not the least restrictive means of furthering any compelling governmental interest—particularly when the State has, for decades, demonstrated its ability to allow the prison chaplain in the execution chamber without compromising any such interest.

86.     Second, the ADOC policy of requiring the prison chaplain, a mainline Protestant Christian, in the execution chamber over Mr. Burton's religious objection also violates the ARFA by substantially burdening Mr. Burton's religious exercise without adequate justification.

87.     Moreover, the requirement of the prison chaplain, a mainline Protestant Christian, in the execution chamber at the time of a Muslim inmate's execution does not further any compelling governmental interest.   In any event, Chaplain Summers' mandatory presence in the execution chamber is not narrowly tailored to achieve any such interest.

## THIRD CAUSE OF ACTION
### Violation of the First Amendment's Establishment Clause
### (U.S. Const. amend. I, as enforced by 42 U.S.C. § 1983)

88.    Mr. Burton re-alleges and incorporates by reference the allegations set forth in Paragraphs 1-87 above.

89.    Federal law permits a cause of action to be brought against any "person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws," and that such person "shall be liable to the party injured in an action at law, suit in equity, or other proper proceedings for redress[.]"  42 U.S.C. § 1983.

90.    Under the First Amendment, "Congress shall make no law respecting an establishment of religion." U.S. Const. amend. I.  This command is also binding on the states through the due process guarantee of the Fourteenth Amendment. *See, e.g.,* *Cantwell v. Connecticut*, 310 U.S. 296, 303 (1940).

91.    "The clearest command of the Establishment Clause is that one religious denomination cannot be officially preferred over another." *Ray*, 915 F.3d at 695 (quoting *Larson v. Valente*, 456 U.S. 228, 244 (1982)).  When government action conveys a denominational preference, it is subject to strict scrutiny. *Larson*, 456 U.S. at 246.

92.     To survive strict scrutiny, the classification must be "narrowly tailored . . . [to] further [a] compelling governmental interest[]." *Gratz v. Bollinger*, 539 U.S. 244, 270 (2003) (quotations omitted).

93.     The ADOC has created a denominational preference by prohibiting an imam from joining Mr. Burton in the execution chamber, while requiring the presence of the prison chaplain, a mainline Protestant Christian.

94.     The ADOC furthers no compelling governmental interest, or any governmental interest for that matter, by preventing an imam from joining Mr. Burton in the execution chamber at the time of his execution.  In any event, that prohibition is not narrowly tailored to achieving any such interest.

95.     There is also no compelling governmental interest in the ADOC's policy of requiring the prison chaplain, a mainline Protestant Christian, in the execution chamber at the time of a Muslim inmate's execution.  In any event, that policy is not narrowly tailored to achieve any such interest.

96.     Accordingly, the ADOC policy of requiring the presence of the prison chaplain, a mainline Protestant Christian, in the execution chamber at the time of Mr. Burton's execution, but excluding religious advisors of other faiths like an imam, violates the Establishment Clause of the First Amendment.[3]

---

[3]     This claim would apply if the prison chaplain were Catholic, Jewish, Buddhist, or any other religion or denomination Mr. Burton does not practice.  Likewise, the claim would lie in a non-Muslim's challenge to the presence of a Muslim chaplain, or a

## FOURTH CAUSE OF ACTION
### Violation of the First Amendment's Free Exercise Clause
### (U.S. Const. amend. I, as enforced by 42 U.S.C. § 1983)

97.     Mr. Burton re-alleges and incorporates by reference the allegations set forth in Paragraphs 1-96 above.

98.     Federal law permits a cause of action to be brought against any "person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws," and that such person "shall be liable to the party injured in an action at law, suit in equity, or other proper proceedings for redress[.]" 42 U.S.C. § 1983.

99.     Under the First Amendment, "Congress shall make no law . . . prohibiting the free exercise" of religion. U.S. Const. amend. I. This command is also binding on the states through the due process guarantee of the Fourteenth Amendment. *See, e.g., Cantwell*, 310 U.S. at 303 (1940).

---

refusal to allow a non-Muslim inmate a religious advisor comporting with that inmate's sincerely held religious beliefs.

Although this claim more accurately and comprehensively arises under the Establishment Clause, equal protection principles also weigh heavily in favor of the relief sought. *See, e.g., Obergefell v. Hodges*, 135 S. Ct. 2584, 2603 (2015) ("Rights implicit in liberty and rights secured by equal protection may rest on different precepts and are not always co-extensive, yet in some instances each may be instructive as to the meaning and reach of the other. In any particular case one Clause may be thought to capture the essence of the right in a more accurate and comprehensive way, even as the two Clauses may converge in the identification and definition of the right.") (citations omitted).

21

100.    The ADOC's policy of requiring and permitting only the prison chaplain, a mainline Protestant Christian, and allowing no other religious advisor—including an imam for Mr. Burton—into the execution chamber at the time of execution infringes on Mr. Burton's free exercise of religion.

101.    There is no valid and rational connection between the ADOC's policy and any purported government interest in security.   Indeed, the ADOC has not identified any particular security concern, and the fact that the ADOC trained and allows Chaplain Summers into the execution chamber demonstrates the feasibility of having a religious advisor present and undermines any argument to the contrary.

102.    Furthermore, Mr. Burton has no alternative means of receiving the spiritual guidance and comfort of a religious advisor of his faith at the time of his execution.

103.    The accommodation of Mr. Burton's request will not cause significant burden to the ADOC.   The ADOC trains and provides security clearances to volunteer chaplains who visit death-sentenced inmates at Holman.   The two imams with whom Mr. Burton visits regularly already have received that training and clearance.   Any additional training to be present in the execution chamber at the time of execution will be slight.

104.    For these same reasons, the ready alternative of allowing an imam to accompany Mr. Burton in the execution chamber at the time of his execution will be of *de minimis* cost to the ADOC.

105.   Based on all the relevant factors, the ADOC policy is not reasonably related to a legitimate penological interest. *See Turner v. Safley*, 482 U.S. 78 (1987).

106.   Accordingly, the ADOC policy and practice of requiring the presence of the prison chaplain, a mainline Protestant Christian, in the execution chamber at the time of Mr. Burton's execution violates the Free Exercise Clause.

107.   Relatedly, the ADOC's exclusion of religious advisors of other faiths, including an imam for Mr. Burton, likewise violates the Free Exercise Clause.

108.   Additionally, the ADOC's approach independently violates the general non-discrimination principles articulated in *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 582 U.S. \_\_, 137 S. Ct. 2012 (2017) and *Masterpiece Cakeshop, Ltd. v. Colorado Civil Rights Commission*, 584 U.S. \_\_, 138 S. Ct. 1719 (2018), as well as the historical understandings of the Free Exercise Clause to provide accommodations to religious minorities such as Mr. Burton. *See, e.g.*, Michael W. McConnell, *The Origins and Historical Understanding of Free Exercise of Religion*, 103 HARV. L. REV. 1409 (1990).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Charles Burton, Jr. respectfully requests that this Court grant the following relief:

1.   Issue a declaratory judgment that the ADOC policy violates Mr. Burton's rights under RLUIPA, ARFA, the Establishment Clause of the First Amendment, and the Free Exercise Clause of the First Amendment;

23

2.      Grant a permanent injunction requiring Commissioner Dunn (and his successors and agents) to permit Mr. Burton a religious advisor of his same faith present in the execution chamber at the time of execution, regardless of the method of execution, subject to proper screening, training, and regulation;

3.      Grant a permanent injunction enjoining Commissioner Dunn (and his successors and agents) from requiring the presence of a prison chaplain who is not of the same religious faith as Mr. Burton in the execution chamber at the time of execution, regardless of the method of execution;

4.      Award all reasonable attorneys' fees, costs, and expenses incurred in prosecuting this action; and

5.      Grant such other relief as this Court deems proper and just.


Respectfully submitted,


MATT D. SCHULZ
NEBRASKA BAR NO. 22968
SPENCER J. HAHN
OREGON BAR NO. 043027
JOHN ANTHONY PALOMBI
KENTUCKY BAR NO. 86784
ASSISTANT FEDERAL DEFENDERS
FEDERAL DEFENDERS FOR THE
     MIDDLE DISTRICT OF ALABAMA
817 SOUTH COURT STREET
MONTGOMERY, AL 36104
(334) 834-2099

24

Spencer_Hahn@fd.org
John_Palombi@fd.org
Matt_Schulz@fd.org

Anand Agneshwar (*pro hac vice* filed herewith)
New York Bar No. 2591030
ARNOLD & PORTER
   KAYE SCHOLER LLP
250 West 55th Street
New York, NY 10019
212-836-8000
anand.agneshwar@arnoldporter.com

Paige Sharpe (*pro hac vice* filed herewith)
District of Columbia Bar No. 982433
ARNOLD & PORTER
   KAYE SCHOLER LLP
601 Massachusetts Ave, NW
Washington, DC 20001
202-942-5000
paige.sharpe@arnoldporter.com

James A. Sonne (*pro hac vice* filed herewith)
California Bar No. 250759
Zeba A. Huq (*pro hac vice* filed herewith)
California Bar No. 261440
STANFORD LAW SCHOOL
RELIGIOUS LIBERTY CLINIC
559 Nathan Abbott Way
Stanford, CA 94305
650-723-1422
jsonne@law.stanford.edu
zebahuq@law.stanford.edu

*Counsel for Charles L. Burton, Jr.*

April 4, 2019